CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED
2/7/2025
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| SANDRA H., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:24-cv-00170 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| MICHELLE KING, | ) | By:   Hon. Thomas T. Cullen |
| Commissioner of Social Security, | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff Sandra Hodges ("Sandra") filed suit in this court seeking review of the Commissioner of Social Security's ("Commissioner") final decision denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401–434.[1] Sandra suffers primarily from back pain, weakness and pain of the hips and lower extremities, obesity, and depression. On review of her application for DIB, an administrative law judge ("ALJ") determined that, despite her limitations, Sandra could still perform a range of light work with additional limitations. Sandra challenges that decision and seeks reversal and summary judgment in her favor. She argues that the ALJ's assessments of her physical and mental impairments and her testimonial allegations, along with his residual functional capacity ("RFC") findings, were not supported by substantial evidence. After a thorough review of the record, the court concludes that the ALJ failed to sufficiently explain

---

[1] Michelle King became the Acting Commissioner of Social Security on January 20, 2025. Under Rule 25(d) of the Federal Rules of Civil Procedure, Michelle King is substituted for Martin O'Malley as the defendant in this suit. *See also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of the Commissioner of Social Security or any vacancy in such office.").

his reasoning regarding the RFC findings in light of Sandra's physical impairments and her obesity. Because that failure requires remand, the court need not address Sandra's remaining arguments.[2] Accordingly, because these analytical and factual omissions frustrate the court's review, the court will grant Sandra's motion and remand this case to the Commissioner for further administrative proceedings consistent with this opinion.

## I. STANDARD OF REVIEW

The Social Security Act (the "Act") authorizes this court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The court's role, however, is limited; it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted). Instead, the court, in reviewing the merits of the Commissioner's final decision, asks only whether the ALJ applied the correct legal standards and whether "substantial evidence" supports the ALJ's findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000).

In this context, "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted). It is "more than a mere scintilla" of evidence, *id.* (internal quotation omitted), but not "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record,

---

[2] The court's decision not to address the remaining grounds Sandra raises in her appeal of the ALJ's decision does not reflect any judgment on the merits of those challenges. The ALJ should consider the veracity of those challenges on remand as well, and Sandra is not barred from reasserting those challenges in future proceedings.

not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (internal quotation omitted). But "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) has been working, (2) has a severe impairment that satisfies the Act's duration requirement, (3) has an impairment that meets or equals an impairment listed in the Act's regulations, (4) can return to past relevant work (if any) based on her residual functional capacity ("RFC"), and, if not, (5) whether she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. RELEVANT PROCEDURAL HISTORY AND EVIDENCE

### A. Procedural History

On March 25, 2021, Sandra filed an application for DIB, alleging disability beginning on March 31, 2019. (*See* R. 39, 74 [ECF No. 5-1].) She later amended the alleged disability onset date to January 1, 2017. (R. 40.) Her date last insured ("DLI")—the date on which she last met the Act's insurance requirement, which is a predicate requirement to receiving benefits—was March 31, 2019. (R. 39.) The DLI is the date by which she must establish disability to receive benefits.

Sandra alleged disability due to: eustachian tube dysfunction with constant ringing in her ears, low back pain radiating into both legs and thighs, bursitis in both hips, neck pain, bilateral shoulder pain, fibromyalgia, fibromyalgia fog, depression, and high blood pressure. (R. 74, 86.) The Commissioner denied Sandra's application initially and upon reconsideration. (R. 83–92.) Sandra requested a hearing and, along with her counsel, appeared telephonically before ALJ Joseph T. Scruton on June 1, 2023. (R. 38–66.) After considering the relevant evidence, Sandra's medical records, her testimony, and the testimony of vocational expert Luke Oliver, the ALJ issued an unfavorable decision on Sandra's claim. (R. 15–31). In summary, the ALJ concluded that Sandra suffered from several severe medical impairments, but that she retained the RFC to perform light work with additional limitations. (R. 20–29.) Because a significant number of jobs exist in the national economy that an individual with Sandra's limitations could perform, the ALJ determined that Sandra was not disabled within the meaning of the Act. (R. 29–31.) The Appeals Council denied Sandra's request to review

that decision (R. 1), and Sandra filed suit in this court seeking review on March 6, 2024 (Compl. [ECF No. 1]).

**B. Legal Framework**

A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week, despite her medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). The ALJ makes the RFC finding between steps three and four of the five-step disability determination. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017) (citing 20 C.F.R. § 404.1520(e)). "This RFC assessment is a holistic and fact-specific evaluation; the ALJ cannot conduct it properly without reaching detailed conclusions at step 2 concerning the type and [functional] severity of the claimant's impairments." *Id.*

The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by definition "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional restriction that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). The RFC should reflect credibly established "restrictions caused by medical impairments and their related symptoms"—including those that the ALJ found "non-severe"—that impact the claimant's "capacity to do work-related physical and mental activities" on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1, *2.

Second, the ALJ's decision must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explain how he weighed any inconsistent or contradictory evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will affirm the ALJ's RFC findings when he considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and the written decision built an "accurate and logical bridge from that evidence to his conclusion[s]," *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *see Shinaberry v. Saul*, 952 F.3d 113, 123–24 (4th Cir. 2020); *Thomas*, 916 F.3d at 311–12; *Patterson*, 846 F.3d at 662–63.

## C. Medical Evidence

On July 10, 2017, Sandra saw Dr. John A. Boone of Boones Mill Family and Internal Medicine. (R. 320.) She presented with back pain and pain in her right hip, which "radiates into [the] buttock and down the outside of the leg." (*Id.*) At that time she was 5 feet 9.5 inches tall, weighed 290 pounds, and had a BMI of 42.21 kg/m2. (R. 321–22.) Dr. Boone diagnosed Sandra with greater trochanteric bursitis of both hips, prescribed her Voltaren, and referred her to interventional radiology for a fluoroscopically guided injection. (R. 322.) Sandra received her injection on July 18, which reduced her pain from an 8/10 to a 2/10 on the self-reported 10-point pain scale. (R. 414–15.) Dr. Boone also noted that Sandra was currently on Celexa for depression, but that her mood, affect, behavior, and judgment were "normal." (R. 321–22.) No other abnormalities were noted in her physical exam. (*Id.*)

On November 28, Sandra again saw Dr. Boone, this time for breathing problems and associated chest pain. (R. 313.) During the appointment, Sandra stated that she had been pulling and repositioning her bedridden uncle, but otherwise had not engaged in heavy lifting or sustained an injury. (*Id.*) Dr. Boone diagnosed her with rib pain, segmental and somatic dysfunction of the rib cage, muscle spasm of the back, and somatic dysfunction of the lumbar region. (R. 315.) Dr. Boone then provided osteopathic manipulative treatment ("OMT"), which improved her symptoms. (*Id.*)

On April 6, 2018, Sandra saw Dr. Boone for a routine annual exam. (R. 308.) She presented with high blood pressure (142/90), a weight of 294 pounds, and a BMI of 43.42 kg/m2. (R. 310.) Dr. Boone noted objective findings of back pain (tenderness, spasms) and trace edema, but no other abnormalities. (*Id.*) Dr. Boone ultimately diagnosed Sandra with hypertension, chronic midline low back pain without sciatica, greater trochanteric bursitis of the right hip, and Class 3 obesity without serious comorbidity. (R. 310–11.) He also noted that Sandra was "negative for depression" and that she was doing "very well" with her Celexa. (*Id.*) Dr. Boone encouraged Sandra to walk daily and increase her efforts to lose weight and control her diet. (R. 311.) He also referred her to physical therapy for her back and hip pain. (R. 310–11.)

Sandra began physical therapy at Franklin Memorial Hospital on April 23. (R. 304.) Sandra reported to the physical therapist that she has had back and hip pain for the last 6 years, had cared for her mother for several years, which included lifting and pulling, and that she has difficulty tolerating prolonged sitting, standing to do dishes, or sweeping for longer than 15

minutes. (R. 305.) The physical therapist recommended a plan of treatment with various interventions for a period of 6 weeks, twice per week. (R. 307.)

On May 4, Sandra went for a follow-up physical therapy appointment. (R. 301.) The record indicates that she made "fairly good progress" and reported "some improvement" including that her back pain was no longer constant. (R. 303.) Shortly afterward, however, Sandra was discharged from physical therapy, at her request, because of a lack of insurance coverage. (R. 301, 303.)

On August 2, 2018, Sandra saw Dr. Stephen F. Cromer, an orthopedic and sports medicine physician, for complaints of bilateral hip pain and lower back (lumbar) pain. (R. 295–96.) Sandra's vitals included a blood pressure of 144/98 and a weight of 297 pounds. (R. 297.) On initial review, Dr. Cromer noted back pain and joint pain, but no myalgias or other abnormalities, including depression. (R. 297.) Specifically, he found tenderness of the greater trochanter and distal gluteal tendons, but normal gait and a full range of motion of the lumbar spine. (R. 297–98.) Dr. Cromer reviewed Sandra's X-rays, which revealed minimal osteoarthritis of the hips and sacroiliac joints bilaterally and, in the spine, multilevel facet arthrosis and multilevel degenerative disc narrowing. (R. 298.) As a result, Dr. Cromer diagnosed Sandra with chronic bilateral low back pain with bilateral sciatica and bilateral hip pain. (*Id.*) He then administered a gluteal tendon sheath injection. (R. 298–99.)

On September 11, Sandra saw Dr. Cromer for a follow-up appointment. (R. 289.) She informed Dr. Cromer that she still experienced bilateral hip pain, particularly on the right side, but that the previous injection reduced her pain by approximately 50%. (R. 290.) No other changes were noted from her last appointment. (R. 290–92.) To further treat her pain, Dr.

Cromer administered a right intra-articular hip injection, which she tolerated well. (R. 292–93.)

On October 9, Sandra had a second follow-up appointment with Dr. Cromer. (R. 285.) During the appointment, Sandra stated that the September 11 injection only gave her 10% relief, and that she continues to have lateral hip paint radiating to her knees. (R. 286.) Once again, Dr. Cromer's objective evaluation of Sandra was unchanged. (R. 287–88.) Dr. Cromer referred Sandra for an MRI, which she completed on October 19. (R. 284, 288.)

On October 22, Sandra met with Dr. Cromer regarding the results of her MRI. (R. 280–81.) Dr. Cromer noted no abnormalities in the MRI and stated that the "MRI of the pelvis [was] within normal limits." (R. 283.) From those results, Dr. Cromer concluded that Sandra's hip pain must have been "referred pain from the lumbar spine." (*Id.*) Accordingly, Dr. Cromer referred Sandra for an MRI of the lumbar spine. (*Id.*)

On November 20, Sandra followed-up with Dr. Cromer regarding the results of her spinal MRI. (R. 275–76.) According to Dr. Cromer, this MRI demonstrated "degenerative disc disease with mild foraminal narrowing at the L4-L5 level." (R. 279.) But Dr. Cromer also determined that, in his opinion, this did not explain her symptoms—which remained unchanged—so he referred her to Dr. Mark Kasmer for a second opinion. (*Id.*)

On February 5, 2019, Sandra met with Dr. Kasmer regarding her lower back and hip pain. (R. 271–72.) During the exam, Dr. Kasmer noted a blood pressure of 167/94, a weight of 294 pounds, and mild tenderness in her back. (R. 273.) Sandra's exam was otherwise normal, with no apparent problems with gait, strength, or range of motion. (R. 273–74.) Dr. Kasmer suggested conservative treatments, Naproxen, and continued physical therapy. (R. 274.)

On April 9, 2019, Sandra returned to Dr. Boone for her routine annual exam. (R. 268.) She complained of total body pain, stating that she "feels like she has fibromyalgia," and temperature control issues. (R. 268.) She also admitted to feeling hopeless, which Dr. Boone noted as an indicator of depression. (R. 270.) The objective exam demonstrated a blood pressure of 125/66, a weight of 295 pounds, a BMI of 42.92 kg/m2, and diffuse musculoskeletal tenderness, but no other physical or psychiatric abnormalities. (*Id.*) Dr. Boone diagnosed Sandra with hypertension, Class 3 severe obesity without serious comorbidity, chronic depression, fatigue, myalgia, arthralgia, disorder of the bone and articular cartilage, and mild major depressive disorder (single episode). (*Id.*) Of these conditions, Dr. Boone found Sandra's hypertension was under good control with medication, her obesity was stable, and her depression was acceptably controlled by Celexa. (R. 271.) Dr. Boone advised Sandra to increase her exercise and adopt a heart-healthy diet. (*Id.*)

On September 16, Sandra saw Dr. Boone for a follow-up regarding her chronic pain management. (R. 261–62.) At that appointment, Dr. Boone diagnosed her with spinal stenosis of the lumbar region, lumbar disc herniation, and anterolisthesis; he also raised the dosage of her prescribed Gabapentin after noting positive benefits. (R. 266.)

On April 10, 2020, Sandra returned to Dr. Boone for her regular annual exam. (R. 256–57.) In that exam, Dr. Boone noticed a slight increase in weight—302 pounds—and BMI—43.96 kg/m2—but otherwise no significant change in any of Sandra's conditions or diagnoses. (R. 259.) A similar annual exam conducted on April 12, 2021, also demonstrated no change in Sandra's condition or diagnoses, other than a slight increase in weight. (R. 248–52.)

On June 21, 2021, Sandra visited Wilson Chiropractic Clinic for an initial appointment. (R. 455, 466.) She described her complaints as back pain with pain radiating down her left leg and aching in her left and right hips radiating down both legs. (R. 466.) Additionally, she noted her pain as "severe" and that she had pain while walking and standing, the pain was constant, and it inhibited her ability to sleep, work, and perform recreational activities. (R. 455.) The Clinic diagnosed her with segmental and somatic dysfunction of the sacral and thoracic regions, myalgia, and pain in the thoracic spine. (*Id.*) Sandra completed 13 treatments between June 21, 2021, and January 28, 2022, and after each visit she reported an improvement in her pain symptoms. (R. 455–63.)

On October 18, 2021, Sandra saw Dr. Boone for a routine evaluation, during which he noted an abnormal gait and an increase in weight to 311 pounds but an otherwise overall stable condition. (R. 522, 525–26.) Sandra visited Dr. Boone again on March 25, 2022, for a follow-up. (R. 518.) Dr. Boone did not note any significant changes in Sandra's circumstances other than that she discontinued Gabapentin because of trouble concentrating, which slightly increased her pain. (*Id.*)

On April 15, 2022, Sandra had her annual examination with Dr. Boone. (R. 505.) During that visit, Dr. Boone noted no abnormalities other than obesity, occasional cough, shortness of breath, wheezing, and a heart murmur. (R. 507–08.) Sandra's weight was 307 pounds, and her BMI was 44.69 kg/m2. (R. 507.) Dr. Boone noted that medications for hypertension and depression were effective and again recommended a heart-healthy diet and exercise. (R. 509.)

On June 28, Sandra presented to Dr. Boone complaining of back pain. (R. 499.) An objective examination found tenderness and decreased range of motion in the thoracic back, and spasms, tenderness, and decreased range of motion in the lumbar back. (R. 501.) Dr. Boone diagnosed Sandra with sacral back pain, bilateral hip pain, chronic midline low backpain without sciatica, chronic right-sided thoracic back pain, rib pain, and multiple somatic dysfunctions (sacral spine, lumbar spine, thoracic spine, pelvis, and rib). (R. 503.) Dr. Boone performed OMT and recommended a follow-up in 4 weeks (R. 503–04), which she did on August 3 (R. 493). Sandra reported that her pain had improved approximately 30% from the last visit (*id.*), and Dr. Boone again provided OMT (R. 497).

On October 17, 2022, Sandra saw Dr. Boone for a medication management appointment. (R. 487.) Dr. Boone's examination noted only obesity and "course breath sounds." (R. 490.) Her diagnoses were largely the same, with Dr. Boone only adding nocturnal muscle cramps. (R. 491.)

On January 12, 2023, Sandra saw physician's assistant ("PA") Alicia Dunleavy for an orthopedic evaluation. (R. 551.) Sandra presented with pain across the posterior pelvis and bilateral posterolateral hips. (*Id.*) After an assessment of objective findings and X-rays, Ms. Dunleavy recommended physical therapy and an MRI. (R. 552.) Ms. Dunleavy also noted that they discussed Sandra's "elevated BMI and its impact on [her] back pain." (*Id.*)

On April 4, Sandra saw PA Dunleavy for a follow-up and to review the results of her MRI. (R. 543.) Ms. Dunleavy concluded that the MRI demonstrated mild-moderate canal stenosis at L4-L5 with facet degeneration/hypertrophy, some foraminal stenosis, and multiple

hemangiomas. (R. 544.) Ms. Dunleavy primarily recommended starting physical therapy and working on weight loss to further improve Sandra's condition. (*Id.*)

On the same day, Sandra also visited audiologist Corinne O'Shaughnessy to address her hearing loss concerns. (R. 563.) That assessment demonstrated mild to moderately severe sensorineural hearing loss in the left ear with a slightly more severe condition in the right ear. (*Id.*)

On April 18, 2023, Sandra began physical therapy at Franklin Memorial Hospital. (R. 577.) She returned for appointments on April 25 and May 4 and reported some progress in her symptoms. (R. 567–68, 572–73.)

### D.  Opinion Evidence

An initial review of Sandra's disability application was completed on November 17, 2021, by Dr. Michael Koch and Dr. Howard Leizer. (*See* R. 68–71.) Dr. Koch opined that Sandra could occasionally lift 20 pounds, frequently lift 10 pounds, and could stand, walk, or sit for 6 hours in an 8-hour workday. (R. 70.) Based on a "DDD [degenerative disc disease] with painful ROM [range of motion]," Dr. Koch said Sandra could only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, or ladders. (R. 71.) Dr. Koch opined that this would have limited Sandra to a "light" RFC, but he concluded that there was insufficient evidence to make a conclusive determination on her claim overall. (R. 68.) Dr. Leizer, reviewing the psychiatric section, similarly concluded that there was insufficient evidence to make a determination on Sandra's claim. (R. 69.) Dr. Leizer made no other observations. (*Id.*)

A second review of Sandra's application was completed on March 9, 2022, by Dr. Bert Spetzler and Dr. Daniel Walter. (*See* R. 74–78.)  In his overall review, Dr. Spetzler concluded

that Sandra's medically determinable impairments ("MDIs") of the back and hips were non-severe and that her allegations of fibromyalgia and eustachian tube dysfunction were not properly diagnosed in the relevant time frame. (R. 75.) Dr. Walter noted Sandra's history of depression, but opined that it was non-severe. (R. 77.)

**E.  Testimonial Evidence**

On May 23, 2021, Sandra's husband completed a third-party function report to support her claims. (*See* R. 200–07.) In that report, he stated that Sandra has trouble concentrating, sitting or standing for long periods of time, and walking far distances. (R. 200.) He also attested that Sandra could only do limited chores, often taking all day to accomplish one task; she could not lift anything without assistance; and that any walking, bending, or stooping caused her pain in the back, legs, and hip. (R. 202–03.)

On June 1, 2023, Sandra appeared telephonically at a hearing before the ALJ. (R. 38.) Sandra first testified about her recent work history as a 911 dispatcher and office manager. She stated that she had to leave her dispatcher job after only a few weeks because of issues with hearing loss and the inability to comprehend the training material due to her medications. (R. 46–47.) Sandra testified that she then went to work for Dock Solutions as an office manager, but also had to leave that job because of the more demanding physical and mental expectations of the position. (R. 47–48.)

Next, Sandra testified about several of her medical impairments. She described her experience with mild-to-moderate hearing loss, how she has difficulty hearing people talk with any type of background noise, and that these issues arose around 2017. (R. 48–49.) Sandra also testified about her problems with back pain and associated pain in her hips and legs. She

described how she has a "pulling" pain in her lower back that often extends into her hips and knees, weaking her legs and leaving her unable to walk or stand for very long. (R. 50–51.) Sandra maintained that she would need to sit for 5 to 10 minutes before standing again, but that even sitting is painful after 20 or 30 minutes, at which point she tries to walk around for a short time or even must lie down for an hour or two. (R. 52–54.)

Sandra testified briefly regarding her depression, how her medication usually works well, but that she has trouble concentrating, focusing, comprehending, and understanding things. (R. 54–55, 57–58.) She also described how she was approximately 310 pounds and has attempted to get out and walk to lose weight but is hindered by her pain and inability to walk or stand for any significant amount of time. (R. 55.) Additionally, Sandra testified that her physical impairments interfere with her ability to do household chores for longer than 5 to 10 minutes and impact her ability to drive or go shopping. (R. 56–59.) On examination by the ALJ, Sandra stated that her condition has gotten worse since 2017, in part due to the physical strain of caring for her ailing mother in the years prior. (R. 59–61.)

**F. The ALJ's Opinion**

In the operative decision, the ALJ concluded that Sandra suffered from degenerative disc disease, gluteal tendinitis of the hip and buttock, arthritis of the hips, obesity, and hypertension, all of which qualified as severe impairments. (R. 21.) He also found that Sandra suffered from eustachian-tube dysfunction and depression, both of which were non-severe. (R. 21–22.)[3] The ALJ went on to determine that Sandra "did not have an impairment or

---

[3] The ALJ further considered Sandra's alleged disability due to fibromyalgia, but concluded that without a proper diagnosis, it could not be recognized as an MDI. (R. 23.)

- 15 -

combination of impairments that met or medically equaled the severity of one of the listed impairments" under the applicable regulations. (R. 23.) "After a careful consideration of the entire record," the ALJ found that Sandra had the RFC

> to perform light work as defined in 20 CFR [§] 404.1567(b) except the claimant can occasionally stoop, kneel, crouch, and climb steps, but never crawl or climb ladders, ropes, or scaffolds. She can never perform outdoor work and can have no exposure to hazards, such as moving machinery and unprotected heights.

(R. 24.) As a result, the ALJ found that Sandra was capable of performing past relevant work as a claims processor, as well as a significant number of other jobs that exist in the national economy. (R. 29–30.) Accordingly, the ALJ concluded that Sandra was not disabled, as defined in the Act, from the alleged onset date—January 1, 2017—through the DLI. (R. 31.)

### III. ANALYSIS

Sandra argues that the ALJ's assessment and findings related to her physical impairments and RFC are not supported by substantial evidence. (Pl. Br. at 13 [ECF No. 11].) Specifically, she contends that the ALJ concluded that multiple "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but did not make any specific findings regarding her ability to walk, sit, stand, or take breaks. (*Id.* at 14–15 (quoting R. 27).) Additionally, Sandra argues that the ALJ failed to properly consider the impact of her obesity by not specifically discussing the effect obesity could have on her other impairments or her RFC and failing to explain how he accounted for her obesity in his RFC findings. (*Id.* at 15–17, 20.)[4] Therefore, she argues that the ALJ has not built a "logical bridge"

---

[4] Sandra asserts that there is no discussion of her obesity after Step 3 of the sequential process, in violation of SSR 19-2p, which requires that the impact of obesity be considered at every step in the sequential evaluation process. (Pl. Br. at 18.)

between the evidence and RFC findings, and his assessments are not supported by substantial evidence. (*Id.* at 24.) On this point, the court agrees with Sandra.

It is certainly true that there is no *per se* rule requiring remand when the ALJ does not perform an explicit function-by-function analysis. *See, e.g.*, *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015.) But remand may still be appropriate where "an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id.* Review is frustrated when the ALJ's opinion determines what functions a claimant can perform, but is lacking in analysis, such as a discussion of a claimant's ability to perform certain functions for a full workday. *See id.* at 636–37.

In this case, while the ALJ conducted a thorough recitation of the relevant evidence and documentation, his discussion of that evidence failed to build a "logical bridge" between the evidence and his conclusions. Other than general assertions that all of the relevant evidence supports the ultimate RFC determination, the ALJ failed to discuss any specific connections between Sandra's MDIs and her functional abilities, including to what degree she could perform those functions and for how long. *See, e.g.*, *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) ("An ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them."). Without more, the court cannot conduct an appropriate review of the ALJ's decision, and the decision leaves the court to guess at how the ALJ arrived at the specific RFC findings. Therefore, remand is necessary on this point.

The court also agrees that the ALJ's lack of discussion or consideration of Sandra's obesity and its specific effects on the RFC findings is error. At step three, the ALJ noted that he considered obesity under SSR 19-2p because "obesity alone or in combination with other impairments may medically equal a listing." (R. 23.) But the ALJ found "no evidence to support such a finding in this case," and stated only that he "considered obesity below in addressing the claimant's residual functional capacity later in this decision." (*Id.*) Thereafter, the ALJ did not address Sandra's obesity with any specificity, including in his RFC assessment. In fact, the only other mention of Sandra's obesity is during a factual recitation of her medical history where the ALJ notes, in passing, that during some of her medical appointments her doctor noted an "obese BMI." (*See* R. 25, 27.) Accordingly, other than to note her documented history of obesity, the ALJ failed to include any specific analysis or consideration of Sandra's obesity in his RFC determination.

In this case, the court cannot conclude that the ALJ "consider[ed] the limiting effects of obesity when assessing [Sandra's] RFC." *See Lakeysia G. v. Kijakazi*, No. 4:22-cv-00005, 2023 WL 2428292, at *5 (W.D. Va. Mar. 9, 2023).; SSR 19-2p, 2019 WL 2374244, at *4. Nor did he "explain how [he] reached [his] conclusion on whether obesity causes any limitations" on any exertional functions—such as walking, standing, or sitting—or the effect of obesity on other routine activity, fatigue, or sustained physical and mental work over time. SSR 19-2p, 2019 WL 2374244, at *4. This lack of analysis or explanation constitutes a failure to properly examine the limiting effects of Sandra's obesity on her RFC, and frustrates the court's review of the ALJ's decision. *See Lakeysia G.*, 2023 WL 2428292, at *5. Therefore, the court finds that

to the extent the ALJ's decision did not discuss or specifically consider the effects of obesity on the RFC determination, the decision must be remanded to include this analysis.

## IV. CONCLUSION

For the foregoing reasons, the ALJ failed to comply with important regulations in explaining his decision. Those failures frustrate the court's review and, accordingly, this case must be remanded to the Commissioner for further proceedings consistent with this opinion. *See* 42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.").

The Clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 7th day of February, 2025.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE